# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES E. FAULKS, JR.,                   :
     Plaintiff,                        :
                                 :
v.                                      :
                                 :
CITY OF HARTFORD,                       :         CIVIL ACTION NO.
JEFF MORRISON, and                      :         3:08-cv-270 (VLB)
CHRISTOPHER SULLIVAN,                   :
     Defendants.                       :         January 19, 2010

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [Doc. ##32, 35]

      This action was filed by the plaintiff, James Faulks, against the defendants, the City of Hartford and Hartford Police Officers Christopher Sullivan and Jeffrey Morrison, on January 18, 2008.  The case was removed to this Court by the defendants on or about February 20, 2008.  The lawsuit arises out of the plaintiff's arrest which occurred on or about January 21, 2006.

      The Plaintiff's complaint consists of six counts.  The First, Third and Fifth Counts are asserted solely against the defendants Christopher Sullivan and Jeff Morrison, in their individual capacities, for false arrest, negligent infliction of emotional distress, excessive force, violation of the Civil Rights Act and violation of the Connecticut Constitution.  These counts also contain allegations that do not amount to viable causes of action.  The only claims asserted against the defendant City of Hartford, in the Second, Fourth and Sixth Counts, are for indemnification of the defendant officers' actions pursuant to Conn. Gen. Stat. § 7-465.  Presently pending before the Court are defendants Sullivan and

Morrison's motion for summary judgment [Doc. #32], and defendant City of Hartford's motion for summary judgment [Doc. #35].  For the reasons set forth below, both motions are GRANTED.

## I.  Factual and Procedural Background

Sullivan and Morrison and the City of Hartford filed their respective motions for summary judgment on June 17, 2009.  Pursuant to Local Rule 7(a), the plaintiff's response to these motions was due on July 6, 2009.  The plaintiff failed to timely file a response.  Accordingly, on November 24, 2009, the Court issued a Notice informing the plaintiff that his failure to respond may result in the sanction of deeming the assertions in a defendant's Rule 56(a)(1) statement as admitted by the plaintiff, or in dismissal of the case for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).  See LeSane v. Hall's Security Analyst, Inc., 239 F.3d 206 (2001).  The Court allowed the plaintiff until December 31, 2009 to respond to the motions for summary judgment.  See Doc. #36.  In addition, the Court contacted the plaintiff's attorney and orally confirmed that he had received the Court's Notice regarding the pending motions for summary judgment.  See Doc. #37.  Nevertheless, to date the plaintiff has failed to respond to the motions for summary judgment or seek an extension of time in which to do so. Accordingly, the Court deems the assertions made in the defendants' Rule 56(a)(1) statements as true, which set forth the following facts.

The plaintiff, James Faulks, at all relevant times, resided at 255 Sisson Avenue in Hartford, Connecticut.  On January 20, 2006, Faulks borrowed his

2

sister, Mary Ann Reliford's (hereinafter "Mary") vehicle so he could go to work. On January 20, 2006, Mary drove to 255 Sisson Avenue and picked up Faulks with her vehicle. After Mary picked up Faulks, Mary drove with Faulks to work in West Hartford at approximately 8:00 a.m., and Faulks left with her vehicle. Faulks was supposed to pick Mary up later that day, at the end of her shift, and bring her home. Faulks was also going to borrow Mary's vehicle and return it at 5:00 a.m. on January 21, 2006.

After dropping off Mary at work on the morning of January 20, 2006, Faulks drove to work. Faulks worked for half a day, but after he felt sick, left work and went home in Mary's vehicle. After arriving at his residence, Faulks took his medications and fell asleep. Faulks did not pick up Mary at the end of her shift on January 20, 2006. After her shift was over, Mary waited for Faulks to pick her up. Faulks did not arrive, so Mary became concerned about her vehicle, and called a friend for a ride home. Mary went home and waited for Faulks to call. At no time on January 20, 2006 did Faulks contact Mary.

After returning from work on January 20, 2006, Faulks fell asleep and woke between 2:30 a.m. – 3:00 a.m. on January 21, 2006. After waking up in the early morning hours of January 21, 2006, Faulks still did not call Mary, even though he believed that she would have been concerned about her vehicle. After waking in the early morning hours of January 21, 2006, Faulks went back to bed, and woke up between 10:30 a.m. and 11:30 a.m. on January 21, 2006. Throughout the night of January 20, 2006 and early morning of January 21, 2006, Mary became worried,

3

as she had no voicemails from Faulks and was unable to get in touch with him even after calling his telephone number.

After Faulks woke on January 21, 2006 between 10:30 a.m. and 11:30 a.m., he did not call Mary to inform her why he did not return her vehicle.  Instead, Faulks picked up his girlfriend, Maria, in his sister's vehicle and they went to the Flamingo Hotel on North Main Street in Hartford.  Faulks and Maria stayed at the hotel for a couple of hours.  While at the hotel, Faulks was not feeling well, so he and Maria left the hotel and Faulks dropped off Maria.  Faulks then went to St. Francis Hospital.  After leaving the hospital, Faulks went home and finally called Mary around 8:00 pm on January 21, 2006.  Faulks informed Mary that he had been at a hotel room with his girlfriend and that he then went to the hospital.

Before Faulks finally called Mary, Mary reported to the police that her car was missing.  After speaking with Faulks on the phone, Mary arrived at Faulks' residence located at 255 Sisson Avenue with her son Kii Glover (hereinafter "Kii") in order to retrieve her vehicle.  When Mary and Kii arrived at Faulks' residence, all three of them were outside in the rear parking lot.  Kii was upset and mad that Faulks did not return Mary's vehicle sooner, and was looking for an explanation.  Faulks was trying to provide an explanation to Kii, but Kii was complaining, fussing and cussing at Faulks about his failure to return the vehicle.  Faulks and Kii were "fussing" and arguing back and forth about the vehicle.  While Faulks and Kii were arguing, Mary was telling Kii to "calm down."  During the argument, Mary called the Hartford Police Department.  Mary informed the police that she

4

had found her car and that they should hurry over because she wanted to leave and because Kii and Faulks were arguing, and that Faulks might "hurt" her son Kii or something to that effect.  The police informed Mary to wait there until an officer arrived.  A dispatch then went out for a report of breach of peace involving a brother and a sister at 255 Sisson Avenue.

Mary eventually flagged down Officer Morrison, who was in front of 255 Sisson Avenue in Hartford.  Mary then walked towards Kii and Faulks with officer Morrison behind her.  As Morrison was walking and speaking with Mary Ann Reliford, he could hear yelling and loud voices coming from the rear of 255 Sisson Avenue.  When Morrison arrived, Faulks and Kii were standing face-to-face arguing.  Faulks was standing and Kii was leaning against a car with his arms folded.  Faulks was providing his explanation to Kii with an angry, loud tone in his voice.  Both Faulks and Kii were talking loud, and both were visibly angry.  According to Faulks, Kii was about to "take it to another level", such as get physical or say something.  Faulks felt that anything could happen, but he did not want to let the situation escalate.

When Officer Morrison arrived, Kii was fussing with Faulks and cussing him out, essentially saying that he thought he was taking advantage of Mary.  When Morrison reached Kii and Faulks, he ordered Faulks to turn around and put his hands behind his back.  However, Faulks did not believe that Morrison had grounds to so do.  Instead of complying with the officer's command by turning

around and placing his hands behind his back, he attempted to provide Morrison with an explanation, and began reaching for his medications.

Eventually, Faulks turned around.  Morrison began his attempt to handcuff Faulks.  However, Faulks kept trying to provide Morrison with an explanation.  Then, at one point, Faulks turned around, still trying to provide Morrison with an explanation.  Morrison told Faulks to turn back around and place his hands on the car.  Kii testified that Morrison might have thought that Faulks was going to run when he turned around.  Faulks eventually turned around and placed his hands behind back.  Morrison then attempted to handcuff Faulks.   In order to safely apply the handcuffs, Morrison was pressing Faulks down onto the trunk of the car, trying to get Faulks to bend over, so he could apply the handcuffs.  Instead of complying, Faulks was resisting Morrison and stopping himself from going down by holding onto the car with his chest and legs.  Morrison kept pressing Faulks down in an effort to place him in handcuffs, but Faulks continued his efforts to stay upright.  In fact, Faulks testified that he did not want to be handcuffed.  Morrison believed that Faulks was attempting to prevent him from applying the handcuffs.

After unsuccessfully attempting to handcuff Faulks, Morrison removed Faulks from the vehicle and they then stood face to face.  Faulks did not turn around again and place his hands behind his back so the officer could handcuff him.  At about the same time, Officer Sullivan came up the driveway of 255 Sisson Avenue, and observed Morrison struggling with Faulks.  Both officers ordered

6

Faulks multiple times to get down on the ground and stop resisting, but he did not comply.  In fact, Mary heard the officers tell Faulks to "get down."  Both officers then struggled with Faulks in an attempt to get him on the ground and place him in handcuffs.  Mary testified that she believed the officer's objective was to get Faulks down on the ground so they could apply the handcuffs.  However, Faulks did not want to go down onto the ground.  Faulks continued with his efforts to stay upright despite the officers' orders to get down.  Faulks wrestled and struggled with the officers as they attempted to get him down onto the ground and into handcuffs.  The officers then used their batons in an attempt to get Faulks down onto the ground and into handcuffs.  It appeared to Sullivan that Faulks was clutching his right hand in a closed fist as if he possessed and unknown object or weapon.  Sullivan struck Faulks in the shoulder with his baton to get him to comply with the officers' commands, but Faulks still did not go down onto the ground.  During this time, Mary was telling Faulks to "lay down, just lay down on the ground."

After a couple of minutes of struggling with the officers, Faulks eventually went down onto the ground and was handcuffed.  There was never a point where Faulks just laid down and put his hands behind his back.  Faulks was charged with breach of peace in the second degree in violation of C.G.S. § 52a-181 and interfering with an officer in violation of C.G.S. § 53a-167a.  On June 28, 2006, Faulks appeared before Judge Bradford Ward in Hartford Superior Court.  See Def. Ex. F, June 28, 2006 Transcript.  Faulks pleaded guilty to breach of peace in

7

the second-degree under the <u>Alford</u> doctrine.  <u>See</u>, Def. Ex. A, p. lines 4-25; Def.
Ex. F, p. 1, lines 9-14.

## II.  <u>Discussion</u>

Summary judgment is appropriate only when "the pleadings, the discovery
and disclosure materials on file, and any affidavits show that there is no genuine
issue as to any material fact and that the movant is entitled to a judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  "The substantive law governing the case
will identify those facts that are material, and '[o]nly disputes over facts that
might affect the outcome of the suit under the governing law will properly
preclude the entry of summary judgment.'"  <u>Bouboulis v. Transp. Workers Union
of Am.</u>, 442 F.3d 55, 59 (2d Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 248 (1986)).

The moving party bears the burden of showing that no genuine issues exist
as to any material facts.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986).
If the moving party meets its burden, "an opposing party may not rely merely on
allegations or denials in its own pleading; rather, its response must - by affidavits
or as otherwise provided in this rule - set out specific facts showing a genuine
issue for trial."  Fed. R. Civ. P. 56(e).  "If the party moving for summary judgment
demonstrates the absence of any genuine issue as to all material facts, the
nonmoving party must, to defeat summary judgment, come forward with evidence
that would be sufficient to support a jury verdict in its favor."  <u>Burt Rigid Box, Inc.
v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

"The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted).  A party also may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

The court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006).

## A.  False Arrest Claim

In his first count, the plaintiff claims that Morrison and Sullivan falsely arrested him.  "[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause."  Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir.2006).  "In analyzing claims alleging the constitutional tort of false arrest, '[the Second Circuit] ha[s] generally looked to the law of the state in which the arrest occurred.'"  Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir.2007) (quoting Davis v.. Rodriguez, 364 F.3d 424, 433 (2d Cir.2004)).

9

In Connecticut, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 186 Conn. 265, 267 (1982). "[T]he applicable law for these two causes of action is identical." Outlaw v. City of Meriden, 43 Conn. App. 387, 392 (1996). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." Berry v. Loiseau, 223 Conn. 786, 820 (1992). The restraint must be accomplished "through the exercise of force." Id. at 821.

"It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest." Johnson v. Ford, 496 F. Supp. 2d 209, 213 (D. Conn. 2007); see also Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004). "The court may determine the existence of probable cause as a matter of law 'if there is no dispute as to the pertinent events and the knowledge of the officers.'" Johnson, 496 F. Supp. 2d at 213 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)); see also Moreno v. City of New Haven Dep't of Police Serv., 604 F. Supp. 2d 364, 372 (D. Conn. 2009).

"[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir.2007) (quoting

10

<u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir.1996)).  "[P]robable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties."  <u>Id</u>.  "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  <u>Id</u>.  In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable."  <u>Id</u>. at 157.

In addition, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."  <u>Miloslavsky v. AES Eng'g Soc'y</u>, 808 F. Supp. 351, 355 (S.D.N.Y.1992), <u>aff'd</u>, 993 F.2d 1534 (2d Cir.1993).  "[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful."  <u>Krause v. Bennett</u>, 887 F.2d 362, 371 (2d Cir. 1989).  Moreover, the failure of an arrest to lead to a conviction does not establish a lack of probable cause for that arrest because "[t]he quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction."  <u>United States v. Fisher</u>, 702 F.2d 372, 375 (2d Cir.1983).

A plaintiff may not challenge the existence of probable cause for his arrest when he been convicted of charges stemming from that arrest.  <u>See</u> <u>White v. Martel-Moylan</u>, 586 F. Supp. 2d 63, 68 (D. Conn. 2008); <u>Pouncey v. Ryan</u>, 396 F.

Supp. 126, 127 (D. Conn.1975) (Newman, J.) (at common law and under §1983 a plaintiff may not bring a claim for false arrest challenging probable cause "in the face of a valid judgment of conviction").  "The application of this policy is most appropriate where . . . the conviction resulted from a voluntary plea of guilty." Pouncey, 396 F. Supp. at 128.

Moreover, when defending against a false arrest claim, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  "[P]robable cause as to any charge at the time of arrest is sufficient to defeat a false arrest claim as a matter of law."  Fredericks v. City of New York, No. 07 Civ. 3659(LAK)(JCF), 2008 WL 506326, at *4 (S.D.N.Y. Feb. 25, 2008) (quoting Davenport v. County of Suffolk, No. 99 Civ. 3088(JFB), 2007 WL 608125, at *5 (E.D.N.Y. Feb. 23, 2007)).  "[A] claim for false arrest turns only on whether probable case existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) (emphasis added); see also Espada v. Schneider, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007) (granting summary judgment in favor of the defendants on a false arrest claim where the plaintiff was arrested for felony assault on a police officer but there was, "at minimum, probable cause to believe that the plaintiff had committed disorderly conduct").

12

Here, it is undisputed that the plaintiff pleaded guilty under the <u>Alford</u> doctrine to breach of peace in the second degree in violation of C.G.S. § 53a-181 and was sentenced to one-year of probation.[1]  During his plea colloquy, the Plaintiff acknowledged that if he were to have a trial on his charge he would probably be found guilty, which would be under the beyond a reasonable doubt standard.  This is tantamount to an admission that probable cause exists, which is a much less demanding standard.  See <u>State v. Patterson</u>, 213 Conn. 708, 720 (1990) ("The quantum of evidence necessary to establish probable cause . . . is less than the quantum necessary to establish proof beyond a reasonable doubt at trial.").  Moreover, even if the Plaintiff had not pleaded guilty to breach of peace in the second degree, the undisputed facts demonstrate that the officers had probable cause to arrest the plaintiff for this offense as well as for the offense of interfering with an officer.  Accordingly, the plaintiff's false arrest claim fails as a matter of law and summary judgment must enter in favor of the defendants on this claim.

## B.  <u>Equal Protection Claim</u>

The plaintiff next alleges that the defendants' conduct was racially motivated in violation of the Civil Rights Act under Title 42 of the United States

---

[1]  "Under <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970), a criminal defendant is not required to admit his guilt . . . but consents to being punished as if he were guilty to avoid the risk of proceeding to trial . . . A guilty plea under the <u>Alford</u> doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless." <u>Myers v. Commissioner of Correction</u>, 111 Conn. App. 405, 406 n. 1 (2008).

13

Code.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  The Second Circuit has recognized that most claims brought under the Equal Protection Clause on the basis of racial discrimination fall into one of two categories.  Henry v. Daytop Village Inc., 42 F.3d 89, 95 (2d Cir. 1994) (citing Yusuf v. Vassar College, 35 F.3d 709 (2d Cir.1994)).  In the first category are claims in which a plaintiff asserts that he was innocent of wrongdoing but has nonetheless been the subject of some wrongful action because of his race.  Id.  In the second category are "selective enforcement" claims by a plaintiff asserting that regardless of his guilt or innocence, certain laws or penalties were applied to him because of his membership in a group whereas they were not applied to others similarly situated individuals who are outside his group.  Id.

To establish a claim for selective enforcement, a plaintiff must prove:  (1) that similarly situated individuals of a different race were not prosecuted for the same offense (thus creating a discriminatory effect in enforcement), and (2) that such selective treatment was based on the impermissible considerations of race or national origin.  United States v. Armstrong, 517 U.S. 456, 465 (1996); Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999).  "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement."  Washpon v. Parr, 561 F. Supp. 2d 394, 409 (S.D.N.Y. 2008) (quoting LaTrieste Rest. v. Village of Port Chester, 188 F.3d 65, 70 (2d Cir. 1999)).  "A

14

showing that the plaintiff was treated differently compared to others similarly situated" is a "prerequisite" and a "threshold matter" to a selective enforcement claim.  <u>Church of the Am. Knights v. Kerik</u>, 356 F.3d 197, 210 (2d Cir. 2004).

"While the Second Circuit has not resolved the question of whether there is truly a distinction between selective enforcement and class of one equal protection theories, courts in this circuit have repeatedly treated them as distinct theories with distinct elements of proof and have accordingly evaluated them as separate claims."  <u>Sloup v. Loeffler</u>, No. 05-CV-1766, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. Aug. 21, 2008) (quoting <u>Bonenfant v. Kewer</u>, No. 05cv01508, 2007 U.S. Dist. LEXIS 64104, at *24 (D.Conn. Aug. 30, 2007)).

"Class of one" equal protection claims are governed by the Supreme Court's decision in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 563 (2000).  In <u>Olech</u>, the Supreme Court held that to establish a class-of-one equal protection violation, a plaintiff must establish that "he has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  <u>Id</u>. at 564; <u>see also</u> <u>Clubside, Inc. v. Valentin</u>, 468 F.3d 144, 158-59 (2d. Cir.2006).  The plaintiff in a class-of-one case uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain."

15

Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008).

In addition to the two elements set forth in Olech, the Supreme Court recently articulated a third element required to bring a successful class-of-one claim.  In Engquist v. Oregon Dep't of Agriculture, --- U.S. ----, 128 S.Ct. 2146 (2008), the Supreme Court held that a class-of-one plaintiff must show that the difference in treatment resulted from non-discretionary state action.  The Court explained that "[t]here are some forms of state action . . . which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise."  Id. at 2154; see also Marino v. Shoreham-Wading River Central School Dist., No. CV-08-0825 (SJF)(WDW),  2008 WL 5068639, at *7 (E.D.N.Y. Nov. 20, 2008) (under Engquist, a plaintiff asserting a class-of-one claim must establish that the differential treatment resulted from non-discretionary state action).

Here, the plaintiff's equal protection claim rests solely upon two unsupported, conclusory allegations in the complaint and discovery responses that fail as a matter of law to satisfy the elements of either a selective enforcement or "class of one" theory.  In his responses to written discovery, the plaintiff indicates that "the initial officers who came to my home were white and I am black.  They did not care about what was actually going on there but were

motivated by the color of my skin."  <u>See</u>  Ex. H, p. 3, No. 18.  This is merely an unsupported conclusory allegation made by the plaintiff.

The plaintiff has presented no evidence whatsoever showing that there were similarly situated individuals of a different race who were not arrested and that such difference in treatment was based upon his race.  Furthermore, there is no evidence in the record that either of the officers made derogatory comments about the plaintiff's race.  In fact, both officers attest that at no time did either of them make any comments about Mr. Faulks' race or national origin.  <u>See</u> Ex. D, p. 4, ¶ 33; Ex. E, p. 2, ¶ 20.  They also attest that their actions were in no way motivated by Mr. Faulks' race or national origin.  <u>See</u> Ex. D, p. 3, ¶ 32; Ex. E, p. 2, ¶ 19.

Finally, the plaintiff has failed to show that the alleged difference in treatment resulted from non-discretionary state action.  Here, the officer's actions involved the exercise of discretion.  <u>See</u> <u>Flowers v. City of Minneapolis, Minn.</u>, 558 F.3d 794, 799-800 (8th Cir. 2009) ("A police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion").  Accordingly, the plaintiff's equal protection claim fails as a matter of law, and summary judgment is granted on this claim.

### C.  <u>Connecticut Constitutional Claim</u>

The plaintiff next claims that the defendants violated the Connecticut Constitution, Article First, Section 9.  The Connecticut Supreme Court has consistently looked to <u>Bivens v. Six Unknown Named Agents of Federal Bureau</u>

of Narcotics, 403 U.S. 388 (1971), and its federal progeny as a guide in determining whether to create a Bivens action for an alleged state constitutional violation.  See Kelley Property Development, Inc. v. Lebanon, 226 Conn. 314, 334-38 (1993); ATC Partnership v. Town of Windham, 251 Conn. 597, 613-14 (1999).  Thus far, the Court has been reluctant to create private causes of action for money damages under the Connecticut Constitution.  See generally ATC Partnership, 251 Conn. 597 (declining to recognize a cause of action for alleged violation of substantive due process rights under article first § 8); Kelly Property, 226 Conn. 314 (same).  In Kelley Property, the Court referenced the Bivens line of Supreme Court cases and noted that, as a general rule, a plaintiff should not be able to maintain a Bivens action unless he can establish that he would otherwise be without any remedy.  See id. at 337-39.

    To date, a cause of action for money damages has been created in only one limited circumstance.  See Binette v. Sabo, 244 Conn. 23 (1998).  In Binette, the plaintiffs, Joseph and Janet Binette, brought suit for compensatory and punitive damages against Police Chief Mahlon Sabo and Police Officer Anthony Languell.  The plaintiffs alleged that the defendants entered their home without permission or a warrant.  Id. at 26.  According to the plaintiffs, Chief Sabo threatened Mrs. Binette with arrest and pushed her, causing her to fall over a table and against a wall.  Id.  The plaintiffs further alleged that Chief Sabo repeatedly slammed Mr. Binette's head against a car.  Finally the plaintiffs alleged that Officer Languell struck Mr. Binette in the head and kicked him while he was lying on the ground

experiencing an epileptic seizure.  Id.  The Court ultimately allowed a claim for violations of Article First, §§ 7 and 9 of the Connecticut Constitution in light of the egregious circumstances of the case.  See id. at 49-50.  The Binette Court, however, made clear that such a remedy is not available in every case involving allegations of state constitutional violations.  Specifically, the Court stated, "our decision to recognize a Bivens-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." Id. at 47.  The Court further held that,

> [w]hether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis . . . . [T]hat determination will be based upon a multifactor analysis.  The factors to be considered include: the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in Bivens and its progeny; the concerns expressed in Kelley Property Development, Inc.; and any other pertinent factors brought to light by future litigation.

Id. at 48.

Subsequent to Binette, the Connecticut Supreme Court reaffirmed its reluctance "to create an all-encompassing damages action for any and all alleged violations of state constitutional provisions."  ATC Partnership, 251 Conn. at 613. The Court further highlighted the fact that their decision to create a private cause of action in Binette was premised upon the egregious police misconduct alleged in that case, namely the physical confrontation with the plaintiffs in addition to the claim of unlawful search and seizure.  Id. at 614-15.  Finally, the Court noted that the governmental status of the defendants in Binette as police officers was

not itself dispositive to the creation of a private cause of action under the state constitution.  Id. at 616.

The Connecticut Superior Courts addressing the viability of a cause of action pursuant to the Connecticut Constitution subsequent to the Binette ruling have consistently held that no private cause of action for money damages exists. See, e.g. Bazzano v. City of Hartford, 1999 WL 1097174, at *3 (Conn. Super. Ct. Nov. 18, 1999) (declining to recognize a private cause of action under Connecticut Constitution, Article First, §§ 7, 8 and 9); Boudreau v. City of Middletown, No. CV 970083396S, 1998 WL 321858, at *3 (Conn. Super. Ct. June 9, 1998) (refusing to recognize a viable cause of action under Article First, §§ 1, 8 and 20 of the Connecticut Constitution); Aselton v. East Hartford, No. X07CV010079187S, 2002 WL 31875443, at *6-*7 (Conn. Super. Ct. Dec. 3, 2002) (declining to recognize a damages claim against a municipality pursuant to Article First, §§ 4, 7, 8, 9, and 14 of the Connecticut Constitution).

Based on the above case law, the plaintiff's claims for violations of Article First, §§ 9 of the Connecticut Constitution fail as a matter of law as no viable cause of action exists under Article First of the Connecticut Constitution under the circumstances of this case.  Unlike Binette, the instant matter does not entail the misconduct the Connecticut Supreme Court found so egregious as to warrant the creation of a private cause of action.  There is no dispute that the instant matter involves no physical confrontation akin to the level of force at issue in Binette.  This case is nothing like Binette, where the husband's head was

**20**

slammed repeatedly against a car; he was struck in the head and kicked while on the ground experiencing an epileptic seizure; and the wife was threatened with arrest and imprisonment and pushed into a wall and over a table.  244 Conn. at 26.  The allegations made by the plaintiff are "a far cry from the alleged egregious police misconduct that [the Court] held to be actionable in <u>Binette</u>."  <u>ATC Partnership</u>, 251 Conn. at 615.  The facts of this case are not sufficiently similar to those at issue in <u>Binette</u> so as to warrant the creation of a private cause of action. <u>Id.</u>

Further, the undisputed facts demonstrate that the officers' actions were clearly warranted under the law.  Morrison received a statement from an independent witness about what was occurring and upon his arrival observed facts that, coupled with Mary's statement, led him to believe that Faulks was engaging in threatening behavior in a public place.  Also, as Morrison was attempting to bend Faulks over to apply the handcuffs, Faulks was interfering by trying to stay upright.  After this first instance of interfering, Faulks then resisted the officers' attempt to get him down onto the ground and into handcuffs. Therefore, the officers' action were clearly warranted by law as these undisputed facts show that the officers had probable cause to arrest Faulks for breach of peace second and interfering with an officer, and the level of force they used was necessary to effect the arrest.

Additionally, there are separation of powers considerations at issue which counsel against recognizing a state constitutional claim.  This case deals with

police action, which is an extension of the executive branch of municipal government.  If a cause of action under the state constitution is created here, it may lead to "second-guessing" by the judiciary of executive actions.  This second-guessing could have a chilling effect on police actions.  "The threat of liability . . . may have a chilling effect on the zeal with which [police officers] undertake their responsibilities."  See Kelly Property, 226 Conn. at 342.

Moreover, as was the case in Kelley Property, the plaintiff has adequate alternative remedies.  He could have brought a negligence claim against the officers, and also has recourse through 42 U.S.C. § 1983, which is one of his claims here.  Therefore, summary judgment is granted in favor of the defendants on the plaintiff's claim for violation of the Connecticut Constitution.

### D.  Excessive Force Claim

The plaintiff next claims that the defendant officers subjected him to excessive force.  Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 388 (1989).  "[A] [p]olice officer's application of force is excessive . . . if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and motive."  Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004).

Application of the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."

<u>Graham</u>, 490 U.S. at 396.  Further, this evaluation must consider all the facts of the case, including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest.  <u>Id</u>. at 396; <u>Carey v. Maloney</u>, 480 F. Supp. 2d 548, 556 (D. Conn. 2007).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . .  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  <u>Graham</u>, 490 U.S. at 396 (internal citations omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  <u>Id</u>. at 396-97.

"Neither the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if he does not resist or attempt to flee."  <u>Soares v. State of Connecticut</u>, 8 F.3d 917, 922 (2d Cir.1993).  However, "[h]andcuffing has been found to give rise to a claim of excessive force where an individual suffers an injury as a result of being handcuffed."  <u>Horton v. Town of Brookfield</u>, No. Civ. A 3:98CV01834, 2001 WL 263299, at *7 (D. Conn. Mar. 15, 2001).  "Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out.  Placing handcuffs on

23

an arrestee tight enough to cause nerve damage may, however, constitute excessive force in violation of the Fourth Amendment."  Rosado v. Williams, No. Civ. A.3:04CV369(JCH), 2006 WL 1168032, at *4 (D. Conn. Apr. 26, 2006).

As described above, "[t]he right of an individual not to be subjected to excessive force has long been clearly established."  Calamia v. New York, 879 F.2d 1025, 1036 (2d Cir.1989).  However, even where a clearly established constitutional right is found, government officials can still enjoy the protection of qualified immunity.  Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998).  The objective reasonableness inquiry is fact-specific to any given case, Graham v. Connor, 490 U.S. at 396.  "The objective reasonableness test is met - and the defendant is entitled to immunity - if officers of reasonable competence could disagree on the legality of the defendant's actions."  Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).  In the context of an excessive force claim, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances."  Id. at 425.  The examination of the reasonableness of an officer's actions is not based on review of all the facts long after the events themselves are over.  Rather, "the reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene."  Graham v. Connor, 490 U.S. at 396.

Summary judgment has been granted in numerous cases involving claims of excessive force on the bases of qualified immunity.  See, e.g., Saucier v. Katz,

533 U.S. 194 (2001); <u>Vaughan v. Cox</u>, 264 F.3d 1027 (11th Cir. 2001); <u>Sinclair v. City of Des Moines</u>, 268 F.3d 594 (8th Cir 2001); <u>Tierney v. Davidson</u>, 133 F.3d 189 (2d Cir. 1998); <u>Salim v. Proulx</u>, 93 F.3d 86 (2d Cir. 1996); <u>Lennon v. Miller</u>, 66 F.3d 416 (2d Cir. 1995); <u>Jones v. Web</u>, 45 F.3d 178, 184 (7th Cir. 1995); <u>Banks v. Person</u>, 49 F. Supp. 2d 119 (E.D.N.Y. 1999).

Here, a reasonable officer could have believed that the level of force used was objectively reasonable in light of the circumstances.  It is undisputed that Faulks resisted Morrison's efforts to handcuff him by attempting to stay upright when the officer needed him to bend over.  Based upon this resistance, Morrison became physical and struggled with Faulks in an attempt to get him down on the ground and in handcuffs.  However, Faulks continued to resist by attempting to stay upright.  Both officers then used their batons in an effort to get Faulks down onto the ground and into handcuffs.  Again, he continued his efforts to stay upright.  It then appeared to Sullivan that Faulks was clutching his right hand in a closed fist as if he possessed an unknown object or weapon, and therefore, he delivered three strikes to Faulks' right shoulder.  Again, Faulks continued his efforts to stay upright.  Finally, with the use of their batons, the officers were able to get Faulks down onto the ground and into handcuffs.

Even if the plaintiff had reasons other than attempting to resist arrest for not bending over initially or trying to stay upright when the officers wanted him on the ground to be handcuffed, the officers are still entitled to qualified immunity because it was reasonable for them to have been mistaken about Faulks'

intentions - there is no dispute that Faulks was actively resisting the officers efforts to handcuff him.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 815 (2009); <u>see also</u> <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

### E.  Negligent Infliction of Emotional Distress Claim

To prevail on a claim of negligent infliction of emotional distress, a plaintiff must plead and prove that:  "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."  <u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. 433, 444 (2003). Furthermore, "the elements of negligent infliction of emotional distress do not require proof of any particular level of intent.  In fact, intent need not be proven at all to establish a claim of negligent infliction of emotional distress."  <u>Stohlts v. Gilkinson</u>, 87 Conn. App. 634, 645 (2005).

As an initial matter, the officers are entitled to governmental immunity as to this claim.  "The [common-law] doctrines that determine the tort liability of municipal employees are well established . . .  Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in

the performance of governmental acts . . .  Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature . . .  The hallmark of a discretionary act is that it requires the exercise of judgment . . .  In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion."  Violano v. Fernandez, 280 Conn. 310, 318 (2006).

"The investigation of crimes and the decisions to make arrests for them is clearly a discretionary rather than a ministerial function."  Skrobacz v. Sweeney, 49 Conn. Supp. 15, 32 (Conn. Super. Ct. 2003); see also Peters v. Greenwich, No. CV950147192S, 2001 WL 51671, at *3 (Conn. Super. Ct. Jan. 3, 2001) ("acts or omissions of police officers in the exercise of their duties are discretionary in nature").  Also, the manner in which a police officer makes an arrest fits within the framework of the day-to-day discretion exercised by police officers.  See Galindez v. Miller, 285 F. Supp. 2d 190, 195 (D. Conn. 2003).  The officers' decision to investigate and arrest Faulks, and the manner in which they effected the arrest, clearly involved the exercise of discretion.  Therefore, the plaintiff's claim is barred unless an exception to discretionary act immunity applies.

"There are three exceptions to discretionary act immunity . . .  First, liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure . . .  Second, liability may be imposed for a discretionary act when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws . . .  Third,

liability may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm."  <u>Violano</u>, 280 Conn. at 319-20; <u>see also</u> <u>Evon v. Andrews</u>, 211 Conn. 501, 505 (1989).

None of these exceptions apply in this case.  The first exception is inapplicable because is no indication in the record that the officers' conduct involved malice, wantonness or an intent to injure.  To the contrary, the undisputed facts demonstrate that the officers' use of force in effecting the plaintiff's arrest was warranted by his actions.  The second exception is clearly inapplicable to this case.  Finally, the third exception is inapplicable because this case did not involve an officer's failure to act.

The emotional distress claim also fails also because the officers' actions were justified pursuant to Conn. Gen. Stat. § 53a-22.  Subsection (b) of this statute provides that "a peace officer . . . is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to . . . [e]ffect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized."  Here, the undisputed facts show that the officers were simply trying to effect the arrest of the plaintiff, whom they reasonably believed committed a criminal offense.

Also, as discussed above, the officer's had probable cause to arrest the plaintiff.  "The existence of probable cause, or a reasonable belief in the

28

existence thereof, negates an essential element of the plaintiff's negligent infliction of emotional distress claim, that element being that the defendants acted *unreasonably*."  See Daniels v. City of New Haven, No. CV010451523S, 2008 WL 5481703, at *3 (Conn. Super. Ct. Dec. 3, 2008).

Finally, in a case involving a public official enforcing the law, public policy dictates that a valid arrest should not be the basis for intentional infliction of emotional distress against the official.  See O'Brien v. Perry, No. CV 980584503S, 1999 WL 124329, at *4 (Conn. Super. Ct. Feb. 19, 1999) ("Public policy militates that law enforcement officials not hesitate to effectuate an otherwise valid arrest not involving the use of unreasonable force for fear of recrimination if the arrestee is displeased.  To hold otherwise would open a Pandora's Box of complaints, and shift the emphasis away from the act of the perpetrator that was the basis for the arrest.").  The same public policy implications cited above come into play for negligent infliction of emotional distress:  an official enforcing the law should not be held liable for improper acts supposedly committed in the course of obtaining an otherwise valid arrest.  "The process of being arrested and prosecuted is, for most of us, inherently unpleasant and distressing. See Brook v. Sweeney, No. CV065005224S, 2008 WL 5481203, at *5 (Conn. Super. Ct Nov. 28, 2008).  Here, the plaintiff has not demonstrated that the emotional distress, which he claims he suffered after his arrest, was outside the range of normal experience.

**F.  Remaining Claims Against Morrison and Sullivan**

Finally, there are allegations in the complaint which do not amount to viable causes of action.  First, the plaintiff alleges that his injuries were caused by the officers, in that they "breached their duty owed to the plaintiff as a citizen."  However, this is not a viable cause of action, and is unsupported by any legal authority.

Next, the plaintiff alleges that his injuries were caused by the officers in that they negligently and carelessly interfered with the plaintiff's civil rights.   The plaintiff has also failed to allege what "civil rights" were allegedly violated.  This is also not a viable cause of action, and is unsupported by any legal authority.

The plaintiff further alleges that after he was arrested, the defendants drove him around and refused his requests for medical attention.  However, this one brief allegation does not amount to a viable cause of action for denial of medical treatment.  In order to prove liability on the part of police officers for the denial of immediate medical treatment, a plaintiff must demonstrate that the defendants denied treatment required to address a serious medical condition because of their deliberate indifference to that need.  Weyant v. Okst, 101 F.3d 845, 856 (2d Cir.1996); City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983).

First, the denial of medical treatment must concern an objectively serious injury.  Weyant, 101 F.3d at 856.  Second, a plaintiff must show that based on what the defendants knew or should have known, the defendants acted with

30

deliberate indifference to plaintiff's serious medical needs.  Id.  Deliberate

indifference is established if the defendant acted "with reckless disregard for the

substantial risk posed by the plaintiff's serious medical condition."  Id.  Under

the subjective test, deliberate indifference requires more than negligence:  an

official "does not act in a deliberately indifferent manner unless that official

'knows of and disregards an excessive risk to [plaintiff's] health or safety; the

official must both be aware of facts from which the inference could be drawn that

a substantial risk of serious harm exists, and he must also draw the inference.'"

Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Farmer v. Brennan,

511 U.S. 825, 837 (1994)).

There are no allegations in the complaint, and no evidence in the record,

that shows the plaintiff suffered from an "objectively serious injury."  Further,

there is no evidence in the record that shows that the officers "acted with

deliberate indifference to plaintiff's serious medical needs."  Accordingly, the

plaintiff does not set out a viable claim and/or cause of action for denial of

medical treatment.

The complaint also alleges that the defendants' conduct subjected the

Plaintiff to a deprivation of rights under the Privileges and Immunities Clause of

the Constitution of the United States.  Article IV, § 2, cl. 1 of the Constitution

provides, in relevant part, "Citizens of each State shall be entitled to all

Privileges and Immunities of Citizens in the several States."  However, the

Privileges and Immunities Clause "does not provide citizens with new and

31

independent rights, but 'establishes a norm of comity' by which citizens of one State coming into the jurisdiction of another are guaranteed equal treatment." Stoianoff v. Commissioner of Motor Vehicles, 107 F. Supp. 2d 439, 446-47 (S.D.N.Y. 2000).  To that end, the Privileges and Immunities Clause does not allow individuals to pursue actions against their own states.  Id.  (citing Zobel v. Williams, 457 U.S. 55, 59 n.5, 102 S.Ct. 2309 (1982)).  In the absence of any allegations that the plaintiff, as a citizen of a State other than Connecticut, was denied equal treatment of privileges and immunities enjoyed by citizens of Connecticut, the plaintiff's Privileges and Immunities claim is facially insufficient and must be dismissed.  There are no such allegations in the plaintiff's complaint and no such evidence in the record.  Accordingly, the plaintiff fails to set out a viable cause of action under the Privileges and Immunities clause.

### G.   Claims Under Connecticut General Statutes § 7-465

The sole claims brought against the City of Hartford are brought pursuant to Conn. Gen. Stat. § 7-465, which is an indemnity statute under Connecticut Law.  See Atwood v. Town of Ellington, 427 F. Supp. 2d 136, 143 (D. Conn. 2006).[2]

---

[2]   **Conn. Gen. Stat. § 7-465 reads: "[a]ny town, city, or borough . . . shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty . . . Governmental immunity shall not be a defense in any action brought under this section."**

32

"Section 7-465 is an indemnity statute; it does not create liability.  Under Section 7-465, the municipality's duty to indemnify attaches only when the employee is found to be liable and the employee's actions do not fall within the exception for willful and wanton acts."  <u>Myers v. City of Hartford</u>, 84 Conn. App. 395, 400 (2004).  Section 7-465 imposes no liability upon a municipality for breach of any statutory duty of its own.  <u>Ahern v. New Haven</u>, 190 Conn. 77, 82 (1983).  "The obligation imposed is indemnification for the legal liability arising out of certain tortious conduct of the municipal employee," and "[t]he municipality's liability is derivative."  <u>Id.</u>  "A plaintiff bringing suit under General Statutes § 7-465 first must allege in a separate count and prove the employee's duty to the individual injured and the breach thereof.  Only then may the plaintiff go on to allege and prove the municipality's liability by indemnification."  <u>Sestiso v. City of Groton</u>, 178 Conn. 520, 527 (1979).

As set forth above, there are no genuine issues of material fact with regard to the plaintiff's claims against Morrison and Sullivan such that they are entitled to judgment as a matter of law and are not liable to the plaintiff for any damages.  Since the defendant City's liability is derivative only, there are no damages for which the municipality is obligated to pay pursuant to Conn. Gen. Stat. § 7-465 and judgment must accordingly enter in the defendant City of Hartford's favor on the Second, Fourth and Sixth Counts.

### III.  <u>Conclusion</u>

Based upon the above reasoning, the Defendants' motions for summary judgment are GRANTED.  The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut:  January 19, 2010.

**34**